**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 13-cr-134-5 (BAH)** |
| **ANTONIO MORENO MEMBACHE,** | |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The Government respectfully submits this Memorandum in Aid of Sentencing, in accordance with Title 18, United States Code, Section 3553(a) and the United States Sentencing Commission, Guidelines Manual, § 6A1.2. The Government seeks a sentence of 120 months imprisonment, which it submits is sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a), and is in accord with the terms set forth in the plea agreement.

I.   **BACKGROUND**

a.   **Procedural History**

On May 9, 2013, a federal grand jury returned an Indictment against Defendant Antonio Moreno-Membache charging that from in or around January 2012 and continuing thereafter up to February 2013, the Defendant conspired with others to commit the following offenses against the United States: (1) to knowingly and intentionally distribute, and possess with intent to distribute, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, on board a vessel subject to the jurisdiction of the United States; and (2) to knowingly and intentionally distribute, and possess with intent to distribute, 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana,

a Schedule I controlled substance, on board a vessel subject to the jurisdiction of the United States, all in violation of 46 U.S.C. §§ 70503, 70506(b), 21 U.S.C. §§ 960(b)(1)(B), (b)(2)(G) and 18 U.S.C. § 2.

On or about January 22, 2014, the Defendant was arrested in Colombia. On or about October 23, 2014, the Defendant was extradited to the United States.

On January 20, 2016, the Defendant pleaded guilty to Count One of the Indictment. That offense carries a statutory mandatory minimum term of imprisonment of ten (10) years and a statutory maximum term of imprisonment of life imprisonment, a fine not to exceed $10,000,000, a period of supervised release of at least five (5) years, and a $100 special assessment. The Defendant pleaded guilty pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), agreeing to a sentence of 120 months imprisonment, unless the Court finds that safety-valve relief is permissible and warranted. Docket Entry 188 ("Plea Agmt.") ¶ 6. The parties did not stipulate to any of the Guidelines factors, but the Government did agree not to seek any of the adjustments set out in U.S.S.G. Chapter 3, Part B. *Id.* ¶ 9. On January 20, 2016, the Court accepted the plea agreement and the Defendant's guilty plea. On March 21, 2016, the Court concluded that safety-valve relief is unavailable to defendants convicted under the substantive and conspiracy provisions of the Maritime Drug Law Enforcement Act, 46 U.S.C. §§ 70503(a), 70506(b). The Defendant is scheduled to be sentenced on May 13, 2016.

**b.      The Defendant's Conduct**[1]

The charges in the Indictment stem from a long-term investigation conducted by the Colombian National Police into dozens of Colombian citizens involved in drug trafficking within Colombia. Among the evidence in the Colombian investigation, which the U.S. Government

---

[1]      The following factual proffer relies on information contained in statements from co-conspirators, lawfully intercepted phone calls, and laboratory analyses. *See* Exhibits 1-3.

obtained via a Mutual Legal Assistance Treaty with Colombia, is evidence of maritime trafficking venture, occurring on the high seas, involving the Defendant and his co-conspirators. Throughout the course of this investigation, law enforcement officers learned that the Defendant's role was to oversee the movement of the cocaine being transported from Buenaventura to Choco, Colombia, its safeguarding in Choco, its loading onto the *Mistby*, among other logistics related to the launch of the *Mistby*. The Defendant also had an ownership interest in the marijuana transported on the *Mistby*.

The investigation revealed that the Defendant worked with co-conspirators in an international drug trafficking organization ("DTO") to transport large quantities of cocaine and marijuana from Colombia to Panama using a go-fast vessel *Mistby*. The Defendant was responsible for overseeing the launch of the *Mistby*, working directly with the members of conspiracy who transported the narcotics, safeguarded the narcotics, loaded the narcotics, and traveled on the *Mistby*. The Defendant attended planning meetings to coordinate the launch of the *Mistby*. The Defendant's co-conspirators would obtain cocaine from a mountainous region in Colombia and transport it to the coastal city of Buenaventura, Colombia, where the cocaine was stored in stash houses. From Buenaventura, the Defendant oversaw, either directly or indirectly, the movement of cocaine to Choco, Colombia by the Defendant's younger brothers—other members of the conspiracy. Once in Choco, the Defendant oversaw the hiding and safeguarding of the cocaine in estuaries by members of the conspiracy. In Choco, members of the conspiracy, including the Defendant, prepared the go-fast vessel and its related equipment for transportation on the high seas. After members of the conspiracy obtained information related to the location and movement of law enforcement and naval ships in the area where the vessel would travel, the Defendant gave advice on whether it was safe for the *Mistby* to launch. Once given a clear travel

3

path, the Defendant oversaw the loading of cocaine and marijuana onto the go-fast vessel *Mistby* and launch of the *Mistby* onto the high seas toward Panama.

While the *Mistby* ultimately launched in June 2012, the planning for the launch of the *Mistby* began in January or February 2012. Prior to the launch of the *Mistby*, the Defendant attended planning meetings with other members of the conspiracy and hosted meetings at the Defendant's beach hut in Choco, Colombia. At the meetings in Choco to discuss the launch of the *Mistby*, the Defendant possessed a loaded pistol, which was carried on his waistband or held in the Defendant's hand. There were numerous attempts to launch the *Mistby*, and prior attempts were delayed due to several factors, including the presence of law enforcement patrols, as well as problems with gasoline supply and a malfunctioning GPS, among other reasons. One particular reason for the delay was a Colombia National Police seizure on March 23, 2012 of 318 kilograms of cocaine from a stash house in Buenaventura, Colombia, resulting in the arrest and conviction of a co-conspirator who managed the DTO's stash house. The DTO had planned to transport these narcotics from the stash house in Buenaventura, Colombia to Choco, Colombia, where they would be loaded onto the *Mistby*. Over a series of lawfully intercepted phone calls, members of the conspiracy discussed the seizure and its effect on the launch of the *Mistby*. One week before the seizure, co-conspirator and previously dismissed co-defendant William Obando-Gonzalez spoke with another co-conspirator about a shipment of cocaine being transported between the laboratory and stash house. The day before the seizure, the Defendant and his brother/co-conspirator and *Mistby* crewmember Jamin Andres Moreno-Membache discussed sending the drugs to Choco on the following Saturday. On the night of the seizure, Obando-Gonzalez told a co-conspirator to delete the phone number of "Alambrito," referring to the stash house manager who was arrested in the March 23, 2012 seizure. Days after the seizure, Jamin

Andres Moreno-Membache reported to another co-conspirator that they would be delayed because people had gone into a house resulting in a substantial loss. Jamin Andres Moreno-Membache reported to another co-conspirator who managed the stash house in Choco, Colombia, that he had not been able to send something due to a search. Crew members on the *Mistby* stated that the stash house seizure resulted in delaying the launch of the *Mistby* because that cocaine was to be loaded onto the *Mistby* and the drugs had to be replaced.

After the March 2012 seizure in Buenaventura, Colombia, members of the conspiracy procured new cocaine to replace that which was seized. The replacement cocaine was transported to Choco, Colombia where it was safeguarded in anticipation of the launch of the *Mistby*. The transportation of the cocaine to Choco and its safeguarding in Choco was overseen by the Defendant. Additionally, given the shortage of cocaine, there was available space on the *Mistby*, and as a result, the Defendant coordinated with members of conspiracy, including co-defendant Mosquera-Murillo, about transporting marijuana that the Defendant owned in part along with Mosquera-Murillo. In a series of lawfully intercepted phone calls, the Defendant communicated about transporting the marijuana on the *Mistby*. Jamin Andres Moreno Membache asked Mosquera-Murillo about "that cilantro you had there on my beach," referring to marijuana located in Choco. Jamin Andres Moreno Membache inquired "if you suddenly have a buyer show up, wouldn't you like to negotiate," to which the Defendant said he "would negotiate." Mosquera-Murillo reported to Jamin Andres Moreno Membache that he had "620," referring to units of the marijuana. Mosquera-Murillo then called the Defendant and reported that Jamin Andres had asked if "I'll sell what we have, what I have there," regarding "the 620 that's there." The Defendant responded, "if he'll buy it, sell that shit, dude." Mosquera-Murillo agreed, "Yeah,

because we have no money and until we get ourselves set up." The Defendant subsequently arranged for co-conspirators to load the marijuana onto the *Mistby* prior to its launch.

On or about June 16, 2012, after members of the conspiracy reported a clear path for travel, the *Mistby* launched for Panama. While enroute, members of the conspiracy reported the presence of law enforcement on the *Mistby*'s route, and the *Mistby* safely returned to Choco, Colombia. Prior to the vessel turning back, in a series of lawfully intercepted phone calls, the Defendant spoke with co-defendant Mosquera-Murillo. The Defendant asked "how's the road," referring to the presence of law enforcement on the maritime route, to which the Mosquera-Murillo responded, "I'm waiting for Ciru to send it to me and I don't know," referring to co-defendant Chang-Rendon, also known as "Cirujano." Hours later, Mosquera-Murillo contacted the *Mistby* captain and reported on the location of law enforcement patrols. The *Mistby* safely returned to Choco, Colombia. On June 19, 2012, the Defendant oversaw the loading of at least 220 kilograms of cocaine and at least 235 kilograms of marijuana onto the go-fast vessel *Mistby*, and the vessel launched onto the high seas subject to the jurisdiction of the United States.

On June 19, 2012, the United States Coast Guard observed the go-fast vessel *Mistby* approximately 70 miles south of the Azuero Peninsula, Panama, on the high seas. The *Mistby* attempted to flee the Coast Guard, and the crew jettisoned items that were later determined to be cocaine and marijuana. United States Coast Guard personnel conducted a right-of-visit boarding of the *Mistby* to determine the vessel's nationality. The master claimed Colombian nationality for the vessel and all four persons on board. The United States law enforcement personnel also discovered an official number and vessel name. Pursuant to a maritime agreement between the United States and Colombia, the Government of Colombian confirmed the nationality of the *Mistby* as Colombian and gave United States law enforcement personnel permission to board and

search the vessel. United States law enforcement personnel subsequently recovered over 220 kilograms of cocaine and 235 kilograms of marijuana that had been jettisoned into the water. On June 26, 2012, Colombian authorities confirmed and concurred with the United States' interpretation of Article 16 of the Agreement Between the Government of the United States of America and the Government of the Republic of Colombia to Suppress Illicit Traffic by Sea, thereby waiving objection to the enforcement of United States law by the United States over the go-fast vessel Mistby, all associated contraband, and persons on board. In a series of lawfully intercepted phone calls at the time of the interdiction, co-conspirators, including the Defendant, communicated about the movement of the *Mistby* and about the *Mistby* crew members being stopped by the U.S. Coast Guard. On June 19, 2012, co-defendant Mosquera-Murillo called the Defendant to report that the *Mistby* had been stopped. Mosquera-Murillo stated, "those guys" had called and stated that there was a "bird" above and that they were "130 away from getting home," referring to a call from the *Mistby* captain informing that a helicopter was overhead and that the vessel was 130 nautical miles from its destination. The Defendant asked, "Where are they?" Mosquera-Murillo responded, "We're looking into where they are, but . . . the girls are behind them at about 90," indicating that Mosquera-Murillo was trying to determine where the interdiction had occurred and noting the location of another law enforcement patrol that the vessel had passed. Mosquera-Murillo stated, "God willing the one overhead will get scared and leave. Because it's not the po-po, it's—" The Defendant responded, "It's the one that . . . the other? Oh those sons of bitches wouldn't call someone else, right? . . . .Then they would have time to get there. They have to get in there any way they can one and for all, right?" The Defendant and Mosquera-Murillo refer to the law enforcement asset belonging to the United States rather than Colombia, and questioning whether law enforcement will call for assistance

7

from another nearby patrol. Mosquera-Murillo then stated, "If they go back, they'll crash. Into the ones they'd passed already," indicating that if the *Mistby* turned around that it would be stopped by the asset it previously passed.

Throughout the course of this investigation, law enforcement officers learned that the Defendant's role was to oversee the transportation of the cocaine from Buenaventura to Choco, Colombia, its storage in Choco, and loading onto the *Mistby*. The Defendant hosted planning meetings in Choco, Colombia at his beach hut to discuss logistics related to the launch of the *Mistby*. The Defendant also owned marijuana located in Choco, Colombia, and he worked with members of the conspiracy to have it transported on the *Mistby*. The Defendant supervised other members of the conspiracy, many of whom were the Defendant's younger brothers, who were responsible for transporting, storing, and loading the cocaine. The Defendant possessed a firearm during the course of planning meetings when discussing the narcotics venture on the *Mistby*. As a trusted member of the DTO, the Defendant's role in overseeing the launch of the *Mistby* was essential in preparing the go-fast vessel for use in transporting cocaine and marijuana on the high seas.

### c.     <u>Legal Framework for Sentencing</u>

The United States Sentencing Guidelines (the "Guidelines") provide strong guidance to the Court in sentencing. Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *United States v. Booker*, 543 U.S. 220, 264 (2005); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("In a post-*Booker* world, the [sentencing] court must calculate and consider the applicable Guidelines range but is not bound by it."). As the Supreme Court stated, "a district court should begin all

sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 39 (2007); *see also United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005); *United States v. Ventura*, 481 F.3d 821, 823 (D.C. Cir. 2007).

After that calculation, a sentencing judge must "tailor the sentencing in light of other statutory factors as well." *Booker*, 543 U.S. at 245; *Coumaris*, 399 F.3d at 351. Those statutory factors include seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes of sentencing (§ 3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the Guidelines range itself (§ 3553(a)(4)); any relevant policy statement by the Sentencing Commission (§ 3553(a)(5)); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6)); and "the need to provide restitution to any victims" (§ 3553(a)(7)). *Gall*, 552 U.S. at 50.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 38, 46.  Nevertheless, the Court at sentencing must make an "individualized assessment based on the facts presented." *Id.* at 50. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 51.

## II.   ARGUMENT

### a.   Probation Department Calculation of Defendant's Guidelines Range

On April 18, 2016, the United States Probation Office filed its Presentence Investigation Report ("PSR"). In determining the drug quantity under the Guidelines to establish a Base Offense Level, the Probation Office held the Defendant accountable for 450 kilograms or more of cocaine and 100 kilograms or more of marijuana. PSR ¶¶ 12, 15, 17. The Probation Office also found that the Defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive, noting that the Defendant supervised the workers who guarded the drugs and supervised the loading of the *Mistby*. It also noted that the Defendant coordinated the transport of drugs from Buenaventura to Choco and oversaw the

10

launch of go-fast boats. The PSR also stated that the Defendant's brothers worked for him, including Jamin Andres Moreno-Membache. PSR ¶¶ 24-25, 34. As a result, the Probation Office found a two-level adjustment for the Defendant's role as a manager or supervisor, pursuant to U.S.S.G. § 3B1.1(b). PSR ¶¶ 25, 34. Additionally, the Probation Office found the Defendant has clearly demonstrated acceptance of responsibility for the offense, resulting in a two-level decrease. PSR ¶ 38, U.S.S.G. § 3E1.1(a).

In the PSR, the Probation Office calculated a Base Offense Level 38, based on the drug quantity, applied a two-level adjustment for role in the offense, and applied a two-level decrease for acceptance of responsibility. PSR ¶¶ 31, 34, 38. With a total Offense Level at 38, Criminal History I, the Probation Office found a corresponding Guideline imprisonment range of 262 to 327 months' imprisonment. PSR ¶ 67.

The Government believes that the Probation Office's assessment of the Defendant's involvement with the DTO and his relevant conduct related to the offense of conviction are accurate and supported by the evidence in this case, but notes that the Government did not seek the role enhancement, pursuant to the terms of the Plea Agreement. Plea Agmt. ¶ 9. Pursuant to the Plea Agreement, the Government may inform the Court and Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed and concerning the Defendant, and the Government is permitted to argue that the Defendant does not meet the criteria to qualify for safety-valve relief.[2] *Id.* ¶¶ 8, 9; *see also, e.g.,*

---

[2]     The Court has ruled that safety-valve relief is unavailable for defendants, like the Defendants in this case, who are convicted under the Maritime Drug Law Enforcement Act. Docket Entry 203. Given that the Defendant reserved his right to appeal the Court's finding on this specific and limited issue, Plea Agmt. ¶ 14, should the Court of Appeals conclude that safety-valve relief is available to defendants convicted under the Maritime Drug Law Enforcement Act, the Government intends to argue that the Defendant does not satisfy the criteria to qualify for safety-valve relief under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 given the Defendant's supervisory role and possession of a firearm, among other reasons.

*United States v. Moncivais*, 492 F.3d 652, 664 (6th Cir. 2007) (recognizing that government providing relevant factual information on which the substantive offense is based to probation office does not constitute recommending a sentencing enhancement in violation of plea agreement); *United States v. Munoz*, 408 F.3d 222, 227 (5th Cir. 2005); *United States v. Levy*, 374 F.3d 1023 (11th Cir. 2004) (per curiam), vacated on other grounds, 545 U.S. 1101 (2005); *United States v. Saxena*, 229 F.3d 1, 6 (1st Cir. 2000); *United States v. Hand*, 913 F.2d 854, 856 (10th Cir. 1990). Accordingly, the Government takes no position on whether the Defendant should receive an aggravating role enhancement and respectfully defers to the Court's discretion as to whether the facts sufficiently support such an adjustment in this case.[3]

Thus, the Guidelines sentencing range of either 235 to 293 months (if the Court finds the facts support the role enhancement, for a Total Offense Level of 38) or 188 to 235 months (if the Court does not find the facts support the role enhancement, for a Total Offense Level of 36) is the appropriate starting point for the sentencing analysis under *Booker* and *Gall*.[4]

**b.    A Sentence of 120 Months Imprisonment Complies With the Factors and Considerations Set Forth in 18 U.S.C. § 3553(a)**

Notwithstanding the Probation Office's calculation of a sentencing range of 235 to 293 months imprisonment, the Government respectfully submits that a sentence of 120 months imprisonment in this case, which is the mandatory minimum for the offense, is sufficient, but not greater than necessary, to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

---

[3]    However, the Government is in agreement with the Probation Office's assessment that a mitigating role reduction is not warranted in this case. *See* PSR ¶ 25.

[4]    While the Defendant concedes in the Joint Statement of Facts that the relevant drug quantity involved over 220 kilograms of cocaine recovered from the *Mistby* (though he objects to it in the PSR), he disputes the inclusion of the 318 kilograms seized from the stash house. Docket Entry 192 ¶¶ 3, 5, PSR ¶ 12, p. 18. Were the Court to find the offense involved over 150 kilograms of cocaine (Base Offense Level 36), found the facts did not support a role enhancement, and applied a two-level reduction for acceptance of responsibility, the Total Offense Level would be 34, with a corresponding Guidelines sentencing range of 151 to 188 months.

1.      **Nature and Circumstances of the Offense, and Need for the Sentence to Reflect the Severity of the Offense**

The Defendant committed a serious crime against the United States, having admitted to conspiring to distribute 5 kilograms or more of cocaine on board a vessel subject to the jurisdiction of the United States. In furtherance of that conspiracy, the Defendant oversaw the transportation of the cocaine from Buenaventura to Choco, Colombia, its safeguarding in Choco, and its loading onto the *Mistby* for further transportation on the high seas. The Defendant supervised other members of the conspiracy, attended planning meetings to discuss the launch, and possessed a firearm during these meetings. The Defendant had an ownership interest in marijuana located in Choco, Colombia and facilitated its transportation on the *Mistby*. The Defendant also engaged in numerous lawfully intercepted phone calls in furtherance of the conspiracy.

The DTO's scheme to engage in maritime smuggling using go-fast vessels on the high seas shows the Defendant's calculated efforts to evade law enforcement detection and a deliberate intent to place others, including the crew members, at significant risk for arrest and imprisonment in foreign countries and risk to physical safety while on the high seas as a result of their smuggling drugs on behalf of the DTO. This activity also reflects a complete disregard for U.S. law prohibiting drug trafficking, of which the Court has already found the Defendant was aware, Docket Entry 181 at 45, as well as the laws of Colombia and the countries' waters that the *Mistby* would travel through while transporting the drugs.

The quantity of cocaine and marijuana smuggled also reflects the seriousness of the offense. In total, the drug quantity in this offense involves at least 538 kilograms of cocaine and at least 235 kilograms of marijuana. Specifically, Colombian authorities seized from a DTO

13

stash house 318 kilograms of cocaine, and the U.S. Coast Guard seized 220 kilograms of cocaine and 235 kilograms of marijuana that had been jettisoned into the water from the *Mistby* as it was approached by law enforcement. As the Court is well aware, cocaine is an extremely dangerous and destructive illegal street drug.  Cocaine abuse has devastated communities in the United States, Colombia, and elsewhere. Drug trafficking is also a very destabilizing and corruptive force in countries throughout the region without sufficient law enforcement institutions to combat it, further adding to the destructive nature of the crime.  Its social costs have been enormous. Additionally, the Defendant's trafficking was not limited to only cocaine, but also marijuana, in which the Defendant had an ownership interest.  The Defendant's offense involved aiding and abetting individuals in Colombia who transported these drugs on the high seas and it also involved the Defendant's direct participation in the conspiracy to transport drugs on the high seas. Thus, the Defendant's crime is undoubtedly serious. Fortunately, the drugs seized in March 2012 and June 2012 did not make it to their destination.

The Government submits, based on the circumstances of the instant case and the roles of the various Defendants, that a sentence of 120 months takes into consideration the nature and circumstances of the conspiracy and the type and quantity of drugs to be distributed. Such a sentence will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct by the Defendant and others who would engage in such illegal conduct and protect the public from further crimes of the Defendant.

### 2.     Adequate Deterrence

Given the adverse impact that drug trafficking has on society, it is important that the Court impose a sentence that deters others from undermining the rule of law.  Further, while this

prosecution disrupted some of the narcotics trafficking from Colombia, continued trafficking on the high seas still occurs. The recommended sentence would provide a critical general deterrence to other narcotics trafficking conspiracies involved in transporting narcotics on the high seas, by demonstrating that such activities will result in substantial sentences.

### 3.      Protect the Public from Further Crimes of the Defendant

Prior to the Defendant's arrest, the Defendant was involved in numerous other cocaine shipments using go-fast vessels on the high seas. These shipments involved a 115 kilogram shipment seized by Panamanian law enforcement in November 2011; a shipment stolen by another drug trafficking organization in August 2011; and a shipment stolen by another drug trafficking organization in July 2011. The Defendant, by overseeing the launch of cocaine-laden go-fast vessels, was responsible for transporting significant quantities of cocaine on the high seas. By pleading guilty, the Defendant has arguably accepted responsibility for his criminal conduct, he will serve an appropriate prison sentence, and as a convicted felon, he will be deported to Colombia.

### 4.      The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) articulates "the need to avoid *unwarranted* sentence disparities among defendants *with similar records* who have been found guilty of *similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added). By its terms, the statute requires a specific evaluation of the compared defendants' records and conduct. When determining whether a sentence creates an unwarranted disparity, the Court should also consider, *inter alia*, a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history, and whether and to what extent a defendant cooperated. *See, e.g.*, *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in

sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's "harsher" sentence was not unwarranted); *United States v. Colwell*, 304 F. App'x 885, 885-86 (D.C. Cir. 2008) (unpublished) (upholding sentence against § 3553(a)(6) challenge on the basis of co-conspirators' criminal history category and number of fraudulent transactions in which co-conspirators participated, how much co-conspirators contributed to conspiracy's success, and crime to which each co-conspirator pled guilty); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007) (concluding sentence not unwarranted because defendant and co-conspirators "did not hold comparable positions, either in the conspiracy or in their workplaces" and co-conspirators "provided substantial assistance in the investigation of the scheme, while [the defendant] did not"). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

However, § 3553(a)(6) is only one factor the Court should consider when sentencing the Defendant. *Colwell*, 304 F. App'x at 886; *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006) ("[T]he requirement that a sentencing judge consider an 18 U.S.C. § 3553(a) factor is not synonymous with a requirement that the factor be given determinative or dispositive weight in the particular case, inasmuch as it is only one of several factors."). Thus, this Court should consider all of the § 3553(a) factors to determine whether they support the Defendant's sentence. *Gall*, 552 U.S. at 49-50; *see also Kimbrough v. United States*, 552 U.S. 85, 108 (2007) ("Section 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities – along with other § 3553(a) factors – when imposing sentences.").

None of the Defendants in the case has been sentenced to date. However, imposition of a term of imprisonment of 120 months for the Defendant will not result in an unwarranted

sentence disparity as contemplated by § 3553(a)(6). For instance, there would be no disparity with co-defendants Chang-Rendon and Mosquera-Murillo who also face the same stipulated term of months. Under the Guidelines calculation, all three Defendants qualify for the same Base Offense Level, and the Government agreed not to seek aggravating role adjustments. Chang-Rendon was responsible for procuring the location of Colombian and United States naval law enforcement patrols, which he provided to Mosquera-Murillo, in order for the DTO to evade law enforcement. Mosquera-Murillo was responsible for recruiting crew members, hosting planning meetings to discuss the launch of the *Mistby*, and receiving the location information from Chang-Rendon to use to advise the DTO on maritime routes and timing for the go-fast vessel's launch. Though the roles of Chang-Rendon and Mosquera-Murillo were different, each were nevertheless critical to the success of the mission. Thus, the nature and extent of their participation in the criminal activity, their criminal history (both are Category I), and the fact that none cooperated are among the factors which make them similarly-situated defendants. In light of this, sentencing the Defendant to 120 months imprisonment is reasonable and will not result in an unwarranted sentence disparity.

Further, as noted, sentencing disparity is not the dispositive or determinative factor. The parties engaged in several rounds of plea negotiations. Various considerations went into the parties' decision to resolve the case by plea and to arrive at the stipulated term of years contained in the Defendant's plea agreement. Notably, the plea agreement was reached on the date the trial had been scheduled to begin. Moreover, the plea agreement reached with the Defendant was a "wired" plea agreement involving all three Defendants remaining in this case. The resolution of the Defendant's case, along with his conspirators, has resulted in benefits to all parties and a saving of significant resources on both sides, as well as for the Court. Taking into consideration

17

all of the above and the goals of § 3553(a), the Government submits that a sentence of 120

months imprisonment, in accordance with the Rule 11(c)(1)(C) plea agreement, yields a sentence

that is sufficient but not greater than necessary to achieve the purposes of § 3553(a).

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the United States submits that a sentence of 120 months,

which is the mandatory minimum for the offense, would be reasonable and would account for

each of the factors set forth in 18 U.S.C. § 3553(a). Therefore, the United States respectfully asks

this Court to impose upon the Defendant a sentence of 120 months imprisonment.


Respectfully Submitted,

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice


By:      _____/s/_____
Adrienne L. Rose
Paul Laymon
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division,
United States Department of Justice
145 N Street, NE
East Wing, Second Floor
Washington, D.C. 20530
(202) 514-0917 (main)

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via the CM/ECF system, to counsel of record for the defendants, this 6th day of May 2016.

_/s/_
Adrienne L. Rose
Paul Laymon
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
Department of Justice

19